Our fifth case this morning is Greenwald Family Limited Partnership v. Village of Mukwonago. Mr. Simcato, whenever you're ready. Good morning. My name is Joe Simcato. I'm here for the appellant's Greenwald Family Limited Partnership. May it please the court. The village and the district court applied the conceivable rational basis test to dismiss GFLP's class of one equal protection claim. GFLP argues the test does not apply in a case like this. But if it did, the facts show there was no such rational objective basis for the actions taken against GFLP by the village, in particular through the very hostile actions of its former village manager. My focus today is on a particular matter. There are many discussed in the briefing. This relates to a transaction in a property known as Chapman Farms. GFLP, I'll refer to as GFLP, wanted a simple one lot CSM, a certified survey map. This is how you carve out a smaller portion of property from a large former farm, for instance. The nature of the CSM they wanted would result in only a single lot of four acres. That type of approval is ministerial under the statutes. Indeed, the engineer for the village approved it initially. However, the planner got involved then and issued a memo. His initial memo does not mention things the village has focused on, which is providing access for the parent property under the Chapman's. So, Mr. Sincada, before you get any further down this line, it may not make any difference. I recognize that. But your opponents point out that your clients didn't pursue a variety of remedies under state law that were available to them after they received these adverse rulings at the village level or the board level or the local level. And the federal courts are reluctant to make every disappointed land use applicant, you know, somebody who suddenly has a federal case. And so I'm interested in whether this is the unusual case where there really is a federal claim. The district court found a rational basis for the things that had happened. It may not be the only finding you could make, but it doesn't have to be. Thank you, Your Honor. The initial part of this transaction, this matter of Chapman Farms, was the village conditionally approving the CSM, in effect denying it. The argument is, well, you should have appealed that. But the matter is much broader because then what the village did is they bought the property out from under GFLP. But didn't they check to make sure it wasn't actually at that time being marketed to anybody else? It was a couple of years, as I remember. Yes, they bought the property, but when you say, I mean, you're kind of characterizing it. But I get it. It was just a piece of property at that point, which they could buy if they wanted to. Well, the record doesn't show. Well, the village shouldn't be buying property on speculation, which is what the facts show this was. Well, that's not a federal problem. That's wasting the taxpayers' money, and maybe somebody should be voted out of office. Perhaps, although the justification to support the conceivable basis test is just that, that we have the right to buy this and we're better at it than GFLP. This is the problem. So when you look at the matter as a whole on Chapman Farms, the facts show an intent to harm GFLP intentionally. This is the essence of the Equal Protection Claim. And the facts subsequent to the conditional approval, which says build a road immediately for a million dollars and provide a developer's agreement, which we did, if you look at those actions, it seems to me you can consider the previous actions, too, which are making it very difficult for GFLP to even buy this property at the outset. That's consistent with the intent to prevent them from doing it. They didn't buy it later. They bought it very soon after. Countless land use decisions help some people and hurt other people. I mean, you build a road, and all of a sudden there's some busy road next to you, and I'm assuming away any issue of eminent demand or, you know, somebody's disappointed because instead of townhouses coming in on the other side of their street, it turns out to be a giant high rise. I mean, people are constantly disappointed by land use decisions, and they have an effect on property values, and yet they're not all class of one cases. Well, that may be, although from the perspective, if you will, Your Honor, I say this carefully, from a plaintiff, a property owner, that really doesn't make sense to them. They own the property, and in this case, under these facts, they feel, and I think the facts justify this feeling, that they're intentionally targeted to harm them in the use of their property. Chapman Farms is emblematic of the systematic animus and actions taken by the village against GFLP based on the facts and in our view. I want to highlight. I mean, it does seem like the relationship soured when Mr. Weidel, is that his name? Yes, Weidel, I think. Weidel, okay, when Mr. Weidel took over in his position. But in keeping with the questions Judge Wood is asking you, how do you associate this case, or how do you fit it within the ambit of our precedent in this area? When I look at the fact patterns, for example, in Janoski, Swanson, Fredrickson, what you're complaining of doesn't seem to be in that universe. Okay, I'm going to have a hard time because I look at it kind of differently. I see the mayor in Swanson being very much like the village manager in Greenwald. He's after them. He's writing emails harassing them. He's trying to sour the well for other potential developers to come in and buy their property. And the mayor's conduct in Swanson was a little more severe than that. The mayor was breaking into houses, reporting people as being drug dealers when they weren't. Well, the continuum perhaps provides some distinction. It seems to me that Mr. Weidel was attacking GFLP to his department heads and to the public with the same purpose, to harm them in this context in their property rights, and because he felt he knew better than them. And so I hope ñ well, let me highlight one fact that also shows that. Mr. Weidel was insisting, the village manager, the former village manager, pardon me, was insisting on a right of first refusal as part of another matter in the chronology against a single property owner. We've highlighted this in our brief a couple points. It wasn't really addressed by the village or the district court. Only against the Greenwells. It seems to me this is a manifest intent to harm them or to take actions to prevent them from buying a piece of property. My point on that is they shouldn't be doing it at all, but what it raises is this. It's a Judge Wood idea here. To allow such broad discretion in what is in effect decision-maker at a village, municipal level, to decide, you know what, these property owners, this property owner, they're a kind of a pain. They're more than that. They're a detriment in my view. And so I get to treat them worse. That's to me ñ That's my problem. That's where we are. Maybe that's the first layer, but if the overall state law system constrains that discretion through writs of certiorari or through whatever procedural mechanism that particular state uses, then I'm not sure the end of the story ñ it's a little bit like the old Williamson case, but the end of the story may not be just this wild, unfettered, I'm going to do whatever I want to do with anybody picture that you're painting. I would argue that the federal relief needs to be a part of that. I would argue that the actions ñ these are not disputed facts, these emails. This type of conduct is encouraged, frankly, by certiorari, which is very rubber-stampish at the state level. I do a lot of this work. And it's encouraged by the fact that these cases that I'm here on are very hard to get to a trier of fact. And so I think what you see is this resistance or reluctance to allow a lot of Class I cases, allowing this kind of conduct. And going back to my perspective as a plaintiff and as the property owner, people are amazed that this is allowed and that the rule is designed in some way to protect the government and not the property owner, which just seems like where we are. We're trying to avoid the government being accountable to a jury. I'm going to reserve the rest of my time. That's fine. Thank you. Thank you. Mr. Bitar. Good morning. Remzi Bitar on behalf of the Village of McGuanagill. May it please the Court. There's a couple of flaws in plaintiff's theory. First, they are trying to ditch the conceivable rational basis test in this case because they have no comparator at all. Is there any difference between a rational basis and a conceivable rational basis? It seems to me it's just extra verbiage. The rational basis test is well established in the Supreme Court's jurisprudence as being extremely deferential to the state actor's decision-making process. And I just don't know where the word conceivable, other than just sort of decoration, is doing any work. Well, it's a concept that is— It's a statement. It's not a concept. Sure. It's a phraseology you certainly see in some opinions. In other opinions, you see discussion of, you know, was there a rational basis? And then the Court will go on. Think of City of New Orleans against Duke, which is an economic regulation case from the Supreme Court. Is there a rational basis? The plaintiff was certain that there wasn't, but the Supreme Court says, no, we can see a rational basis in this regime. I think this Court uses the phrase conceivable rational basis in cases like Fisk and Miller and Chicago Studio. Oh, I don't disagree that you see the phrase. I'm just trying to figure out what's the legal content as compared to just talking about a rational basis. I think the legal content flows from the Supreme Court's cases involving giving rational deference to legislative decision-making. Right, and they just call it the rational basis test in those cases. They do. They certainly do. But this Court often looks to whether or not there's a rational basis, even if it is one that is built on speculation unsupported by evidence or without empirical data. That's from the Shrail case, which was a development case just like this, as was the Fisk case, because the Court, it does not want to become a board of zoning appeals. The Court does not want to become the second guesser of whether a community, when it wants to have development, tries to get a developer to sign a development agreement that contains sureties, promises to complete the construction, paybacks, sometimes called clawbacks in our briefing, paybacks if they don't meet their obligations. Local government does not just willy-nilly hand out tax incremental financing to spur a development. It is a statutory process in Wisconsin. It is up to the village board. It is not up to Mr. Weidel. By the way, this case is clearly distinguishable from Janowski and those other cases. In every one of those cases, like Janowski and Swanson, it was a hapless individual. And sometimes it was police were run amok. Or in that case, it was the mayor, as one of you pointed out, making these comments in public meetings, going after them because he didn't like their fence. That was the mayor. Mr. Weidel is not the mayor. Mr. Weidel is a staff person. He is the village administrator who is charged with, among other duties, assisting the village board in developing the community. He is subject to the village board. Does he have any gatekeeping role? He has no gatekeeping role. The gatekeeping role would actually be the plan commission. And that takes us right back to the Chapman matter, which the plaintiffs tried to attack in this case. You'll note that in all of the emails they referenced involving Mr. Weidel, not one of these involved the Chapman matter. That Chapman matter was 2014, December 2014 and January 2015 timeframe, give or take. Mr. Weidel was not involved in that. That was a matter that was handled by the village independent consultant planner, Mr. Kanuski, and it was before the plan commission. And if the Greenwalds thought that Mr. Kanuski or the plan commission was wrong in requiring them to put in the road, they were requiring that because the seller, Fern Chapman, needed the road to access her property. This is explained in the affidavit of Mr. Kanuski at paragraph 23 and 24 at docket 34. So she was given the option to either put in the road or come up with a development agreement. They didn't want to do that. If they thought it was wrong, they could have taken the matter to the Board of Zoning Appeals and asked the Board of Zoning Appeals, hey, we think that they're interpreting the code wrong. We don't need a CSM. We don't need to put in a road. We don't need a development agreement. They never did any of that. They also never went to circuit court on a writ of certiorari, writ of mandamus, declaratory action, or anything else. Instead, they surfaced these allegations many, many years after the fact. I also want to point out what is a development agreement and not a development agreement. This is a one-page so-called statement and developer's agreement that the Greenwalds believe constitute a development agreement. This is at docket 34, Exhibit 3. And I would ask the court, if you have a moment, compare it to record 48-32, Exhibit 1064. And that is a 32-page development agreement between the village of Maguanago and a company called ACG-Gooden. And by the way, in this case, the village did lay out all of its development agreements over the last 10 years, 22 of them. It's at docket 48-31, pages 3 to 4. And not once, even though it's the Greenwalds' burden, have they shown that they are comparable to anyone else. That's why they get to this argument that we should scratch the rational basis test. But when you look at this development agreement with the Goodens, it's 32 pages long. It's recorded with the clerk, the county clerk. It's between the village and the developer. The agreement that they produced is not with the village. It indicates that a CSM has been applied for and has been granted. It indicates the developer intends to build the project, and it has obligations and promises. The developer is going to build the project for specs and plans. It's going to issue a surety, an irrevocable letter of credit for cost of public infrastructure improvements, site standards. It promises to do the road construction. And there's remedies for default, among many, many other terms in that 32 pages. And this was discussed repeatedly by Mr. Wiedel in terms of what they're looking for from the Greenwalds or any other developer. They want a developer, a guaranteed construction timeline, a guaranteed minimum assessed or developed value, a security on the development and investment by the village, and a guaranteed clawback if the developer fails to perform. All common stuff that every municipality with a development agreement in Wisconsin, probably in Illinois and many other states, too, look for from a developer. If you're going to get public money, either directly or through tax incremental financing, by which the village or a town or a city is going to put in public infrastructure to your development, how you're going to develop that land, the municipality wants to protect the taxpayers. They need to make sure that the project is going to go in, that it is going to hit its assessed value, and therefore pay back the costs for all of the infrastructure, roads, utilities, sewers, what have you. The plaintiffs admit that it is very rational to have a development agreement and to seek to meet those goals. That's at record 49, paragraphs 14, 15, and 13. And so this court doesn't even need to get to all of the hodgepodge of emails that the plaintiffs offer from Mr. Wydell, that they throw into the stew pot, because the court does not get to that stuff. You don't look at the motivation when you can hypothesize a rational basis. And just like in the court's cases of FISC, where financial and economic concerns for a development were a rational basis, and land use planning concerns and questions about whether the developer was properly following the codes and the needs to protect the taxpayers, and just like in Shrail, where there was a refusal to provide water connection to a subdivision, again, there were financial economic concerns, there was concerns about recouping costs, there was significant expense, and that was all rational basis stuff. And in fact, the Shrail case is interesting, because it notes historically, anecdotally, that the developers installed water mains that they then donated to the municipality. That is common practice. The Greenwalds don't want to do any of that, and that's fine. They can own all the land they want to own. They don't have to sign a development agreement. They don't have to do any of that. That's fine. That's why their land is vacant, and other people are putting up Home Depots, Walmarts, multi-use, or multi-commercial developments such as the Maple Center development that is proposed in this case. I see I only have 18 more seconds, and with that, I would respectfully request that this court affirm the summary judgment by Judge Adelman in this case. Thank you. Thank you very much. Mr. Sincada. Thank you. Your Honor, to your point about gatekeeping, that's exactly wrong. Mr. Weidel dominated the village. At Record 4810, there's an email where he refuses to provide a sample developer's agreement. They want it. They approve it. They say you must have the developer's agreement. Mr. Dick Greenwald, 90 years old, he passed away. His niece is helping him. She asked for a sample. He said, no, we're not going to work with you until you basically commit to doing what we want. He was dominating on the village. Here's the developer's agreement that they did provide. What does it say? Sellers are satisfied with the creation of the slot as per the CSM survey, and they are comfortable with being able to use the remainder of their land, totally contrary to what the village is asserting the Chapmans wanted. They're using the Chapmans on hearsay evidence to say they needed to step in and buy this property. When you have facts and dispute like that, and the conceivable basis is why they did something, subjective, please let a property owner have a federal remedy where they can get through summary judgment and those inferences can be inferred in their favor. That's where I think we are in this, and it's frustrating because I worry that we're going to get further and further out where there's going to be favored property owners and there's not going to be, and there's going to be no relief for them. Thank you. Thank you. Our thanks to all counsel. The case is taken under advisement.